IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| DANIEL NORBERT HALTER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:20-cv-00193 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| OFFICER DAVID HANLON, | ) | By:  Hon. Thomas T. Cullen, |
| | ) |       United States District Judge |
| | ) | |
| Defendant. | ) | |

Plaintiff Daniel Norbert Halter ("Halter"), who is proceeding *pro se*, filed this civil complaint under 42 U.S.C. § 1983 against Harrisonburg Police Officer David Hanlon ("Officer Hanlon" or "Hanlon") in both his individual and official capacities, alleging excessive force in violation of his Fourth Amendment rights as well as his Fifth and Fourteenth Amended due process rights. Halter's complaint stems from a July 10, 2019 incident during which Officer Hanlon handcuffed and detained Halter in the back seat of his police vehicle while pursuing a fleeing suspect who had entered the rear of Halter's home. Officer Hanlon has moved for summary judgment on Halter's claims. Because the record is devoid of any evidence that Officer Hanlon used excessive force during this incident or otherwise acted unreasonably in handcuffing Halter, the court will grant his summary judgment motion.

## I.   BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Halter. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

On July 10, 2019, Officer Hanlon—while on routine patrol alone—observed a blue car speeding and passing other vehicles in a turn lane. (Officer Hanlon Affidavit ¶ 2 [ECF No. 48-1].) Officer Hanlon activated his emergency lights and made a U-turn to initiate a traffic stop (Dash Cam Video[1] and Body Cam Video 1 at 19:44:44), but the car sped up, crossing double yellow lines, weaving through traffic, and driving through stoplights. (Hanlon Aff. ¶ 2.) Officer Hanlon pursued the car into a residential neighborhood, where the car made an abrupt turn into a driveway at 914 Chestnut Drive and parked behind the house. (*Id.*; Dash Cam Video and Body Cam Video 1 at 19:45:39.) The male driver was later identified as Ward Smith.[2]

Within seconds, Officer Hanlon, who had parked his cruiser outside the front of the residence, immediately observed a woman—subsequently identified as Smith's mother, Brandy Harper[3]—walking up the driveway from the rear of the house where the blue car was now parked (Body Cam Video 1 at 19:45:50.) Officer Hanlon demanded that Harper tell him the name of the man he was pursuing, but Harper feigned ignorance. (*Id.*) Officer Hanlon then

---

[1] Officer Hanlon supplied three videos in support of his motion for summary judgment; one video from the dash of his car, and two videos from his body-worn camera ("Body Cam"). Each of the three videos are referred to in the "Video at hh:mm:ss" format, according to the running timestamp viewed in the upper right-hand corner of each of them as follows:

    (1) "Body Cam Video 1" – the first clip of Officer Hanlon's Axon body-worn camera video (Exhibit 2 to Officer Hanlon's Affidavit);

    (2) "Body Cam Video 2" – the second clip of Officer Hanlon's Axon body-worn camera video (Exhibit 3 to Officer Hanlon's Affidavit); and

    (3) "Dash Cam Video" – Officer Hanlon's police vehicle-dashboard-mounted camera (Exhibit 4 to Officer Hanlon's Affidavit).

[2] Smith was arrested for various offenses relating to this pursuit and is not a party to this action.

[3] Plaintiff Halter is Harper's husband and Smith's stepfather. (*See* Body Cam Video 2 at 20:02:12.)

instructed Harper to sit on the sidewalk while he investigated. (*Id.* at 19:46:22.) At first, Harper complied, sitting on the steps between the driveway and the front porch. But Harper then abruptly stood up and walked into the house. (*Id.* at 19:47:15.) Officer Hanlon called out for Harper to come back outside, but she ignored him (*Id.* at 19:47:29.) At this point, Officer Hanlon walked to the rear of the house and radioed in the license plate on the blue car as he waited for backup to arrive. (*Id.* at 19:47:29–19:48:10.)

As Hanlon walked back up the driveway to the front of the residence, Harper emerged from the front door of the residence, approaching the officer with her right hand behind her back. (*Id.* at 19:48:20–19:48:35) Observing this, Officer Hanlon ordered her to drop what was in her hand. (*Id.* at 19:48:35–19:48:50.) Harper complied, dropping what Officer Hanlon described as a makeshift weapon consisting of a razor blade taped to a butter knife. Officer Hanlon placed her in handcuffs and had her sit on the curb. (*Id.*) Harper's daughter was watching this scene unfold from the front door, and when Officer Hanlon ordered her away from the house, she complied. (*Id.* at 19:48:38.)

At this point, Plaintiff Halter exited the residence and verbally engaged the officer. (*Id.* at 19:48:40). Officer Hanlon initially told Halter to go back inside the residence but immediately reversed course and ordered Halter *out* of the house because, as he explained in his affidavit, he did not know what relationship Halter had with Smith and whether there were other weapons in the house. Halter verbally challenged the officer, demanding to know what his wife had done and asserting that he had the right to stay where he was because it was "private property." (*Id.* at 19:48:41–54; Officer Hanlon Aff. ¶ 2). Officer Hanlon then handcuffed Halter and then directed him to  the curb next to his wife. (Body Cam Video 1

and Dash Cam Video at 19:48:58.) At about the same time, a second police vehicle arrived on scene, and three or four more police officers approached the house. (*Id.* at 19:48:58–19:50:26.) The officers began investigating the car and searching for the fleeing suspect. (*Id.*) The assisting officers went down the driveway to the rear of the house. The officers then approached the rear entrance to the house and convinced Smith to surrender without further incident. (*Id.* at 19:50:42.)

After Smith was safely in police custody, Halter was placed in the back seat of a police vehicle.[4] (Body Cam Video 1 at 19:51:10.) About nine minutes later, Officer Hanlon walked over to that cruiser to speak to him. When Officer Hanlon opened the door, Halter immediately said, "These are too tight, man." (Body Cam Video 2 at 20:01:07.) Officer Hanlon briefly questioned Halter about what had transpired with Smith and Halter's possible role in it. After this brief discussion, Officer Hanlon removed the handcuffs. (*Id.* at 20:01:12– 20:02:17.) When Officer Hanlon uncuffed Halter, a small indentation where the cuff had been is visible on Halter's right wrist. (*Id.* at 20:02:19.) Halter, however, did not mention that his wrists or arms were hurting at that time, nor did he appear to be in any pain or distress. Indeed, while the officer was explaining to Halter why he had been placed in handcuffs, Halter responded, "I understand . . . I understand." (*Id.* at 20:01:15–20:01:23.) By this time, there were multiple additional police officers on scene.

All told, Halter was handcuffed for about 13 minutes, and in the back of two different police vehicles for just over 11 of those 13 minutes. Halter asserts that he was handcuffed incorrectly—one wrist "to the back of his other wrist" and that "he had to sit on them and

---

[4] It appears Halter may have been moved from one vehicle to another at some point.

the patrol car had only hard plastic as a seat"—which Halter alleges, without any evidence to back it up, caused him long-term nerve damage that apparently has been diagnosed by a doctor at R.M.H. Hospital. (Compl. at 2; Suppl. Compl. at 2.) Officer Hanlon stated in his affidavit that he decided to handcuff Halter and move him away from the house to "preserve [his] safety and preserve the status quo/control the scene while [he] completed his investigation and attempted to apprehend the fleeing felon" because: (1) he was alone at the time with two uncooperative and argumentative individuals; (2) there was a fleeing felon inside the home; (3) Harper had come out of the house with a weapon; (4) he was outnumbered and his backup had not yet arrived; (5) the situation was "volatile and chaotic"; and (6) it was unclear to him who the original violator was, why he fled, where he was inside the residence, and whether or not he was armed.[5] (Officer Hanlon Aff. ¶ 2.)

Halter originally commenced this action against Officer Hanlon and the City of Harrisonburg, asserting four claims under 42 U.S.C. § 1983: (1) excessive force, (2) retaliation, (3) malicious prosecution, and (4) violation of his right to a speedy trial. (*See* Compl. [ECF No. 1].) The court dismissed Halter's original complaint without prejudice and gave him 21 days to file a motion to reopen the case with an amended complaint. (Order, Mar. 31, 2021 [ECF No. 37].) Halter filed a supplemental complaint that withdrew his claims against the City of Harrisonburg and instead asserted (1) excessive force and (2) due process claims against only Officer Hanlon—in both his individual and official capacities—based on the alleged

---

[5] Officer Hanlon adds that, as the situation progressed, he became aware that the police department had earlier been called to the residence for a suicide threat. (Officer Hanlon Aff. ¶ 3.)

constitutional violations described in his original complaint.[6] (*See generally* Supp. Compl. [ECF No. 38].)

On February 1, 2022, Officer Hanlon moved for summary judgment on Halter's claims against him. (ECF No. 47.) In support of his motion, Hanlon filed his affidavit (ECF No. 48-1), his July 11, 2019 Case Narrative (ECF No. 48-2), photographs of Halter's arms and wrists that were taken by the police department on July 10, 2019 (ECF No. 48-3), two police Body Cam videos, and one dashboard-mounted camera video, each depicting the incident underlying Halter's complaint (*see* ECF No. 53). The motion was fully briefed by the parties.[7] Because the facts and arguments of the parties are adequately set forth in their written submissions, the court does not require oral argument on the motion, meaning that Officer Hanlon's motion is ripe for decision.

## II.   STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on

---

[6] By Order entered December 3, 2021, the court granted Halter's motion to reopen, and directed Halter's amended complaint redocketed as a supplemental complaint since the court will consider the facts alleged in Halter's original complaint (ECF No. 1) along with his supplemental pleading (ECF No. 38). (*See* ECF No. 43.)

[7] Without leave, Halter filed two sur-replies styled "additional evidence" (ECF No. 65) and "response" (ECF No. 66). Although the court's rules do not authorize sur-reply filings without leave, the court has considered these two two-page handwritten documents because: (1) one of his filings (ECF No. 65) simply makes the undisputed point that Halter was not arrested on July 10, 2019, and was instead let go, and argues that he was injured through no fault of his own, all of which he has already claimed (*see* Compl. and Supp. Compl., *passim*); and (2) his other filing (ECF No. 66) was completed after he was given the opportunity to view the police body- and dashboard-camera footage on which Officer Hanlon relies (*see* Minute Order, Mar. 29, 2022 [ECF No. 62].)

file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the

nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

## III.   ANALYSIS

At the outset, Halter's claims against Hanlon in his official capacity must be dismissed. As the court previously held:

> When a municipal official or employee is sued solely in his official capacity, the suit will be treated as an action against the municipality which employs him. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). A § 1983 suit against a state official in his official capacity is considered a suit against the state itself when determining whether that suit is barred by the Eleventh Amendment. *Will v. Michigan Dep't of State Police*, 491 U.S. 58[, 71] (1989). In the same manner, a suit against a municipal official in his official capacity is a suit against the municipality, which means the claims against Officer Hanlon are claims against the City of Harrisonburg.

(Mem. Op. pgs. 5–6, Mar. 31, 2021 [ECF No. 36].) For the same reasons that his claims against the City of Harrisonburg failed, his official capacity claims against the officer fall short. (*See id.* pgs. 4–5.) His only potentially viable claims, then, are those asserted against Officer Hanlon in his individual capacity. But for the reasons discussed below, those claims fail as well.

### A.  Halter's Excessive Force Claim

### i.      The Law Applicable to Excessive Force Handcuffing Claims

To state a cause of action under 42 U.S.C. § 1983, a plaintiff must allege facts indicating that he has been deprived of a right guaranteed by the Constitution or laws of the United States, and that this deprivation resulted from the conduct of a person acting under color of state law. *West v. Atkins*, 487 U.S. 42 (1988). "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"

*Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.*

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 179 (4th Cir. 2018) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness standard." *Id.* Under this standard, "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on scene rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see also Terry v. Ohio*, 392 U.S. 1, 20–22 (1968). "Determining the reasonableness of an officer's actions 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Dolgos*, 884 F.3d at 179 (quoting *Graham*, 490 U.S. at 396.) The analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight[,]" but these factors are non-exhaustive. *Graham*, 490 U.S. at 396; *see also Dolgos*, 884 F.3d at 179.

Handcuffing suspects is neither *per se* reasonable nor unreasonable; rather, "the Fourth Amendment requires the court to assess the reasonableness of using handcuffs based on the circumstances." *Dolgos*, 884 F.3d at 180 (citing *United States v. Drayton*, 536 U.S. 194, 201 (2002)). "[A] standard procedure such as handcuffing [will] rarely constitute excessive force where the

officers [are] justified . . . in effecting the underlying arrest." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002).

As with an arrestee, police may detain and handcuff other persons in the vicinity of a search, so long as the action and force used to effectuate it are reasonable under the circumstances. *See Muehler v. Mena*, 544 U.S. 93, 98–99 (2005) (holding that the temporary handcuffing and detention of the occupants of a home where a search warrant was being executed "was reasonable because the governmental interests outweigh[ed] the marginal intrusion.") (citing *Michigan v. Summers*, 452 U.S. 692 (1981), and *Graham*, 490 U.S. at 396). Despite the intrusive nature of a detention accompanied or effectuated by handcuffing, "the use of handcuffs serves to minimize the risk of harm to officers, the arrestee, and bystanders." *Id.* at 100. And the risk of harm to both police officers and others on the scene of a search is minimized "if the officers routinely exercise unquestioned command of the situation." *Summers*, 452 U.S. at 703. "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler*, 544 U.S. at 98 (citing *Summers*, 452 U.S. at 705). While handcuffing in a situation where a weapon is involved alone justifies using handcuffs, "the need to detain multiple [persons] ma[kes] the use of handcuffs all the more reasonable." *Id.* at 100. The court also considers "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. "[J]udges should be cautious about second-guessing a police officer's assessment, made on the

scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012).

"[T]he majority of federal circuit courts have rejected the notion that handcuffing a custodial arrestee, without more, is excessive." *Dolgos*, 884 F.3d at 193–94 (Shedd, J., concurring) (collecting cases); *see also Brissett v. Paul,* 141 F.3d 1157, No. 97-6898, 1998 U.S. App. LEXIS 6824, at *14–15 (4th Cir. April 6, 1998) (affirming district court's decision that a police officer did not use excessive force because, even though the plaintiff alleged that the officer pushed him into the police car and handcuffed him while holding his arms in such a way as to inflict pain, there was no proof that he sustained any major physical injury). "[T]he prevailing federal rule appears to be that an arrestee may pursue a Fourth Amendment excessive force claim based on the use of handcuffs only in very limited circumstances, such as when the handcuffing causes physical injury." *Dolgos*, 884 F.3d at 195. One district court in this circuit recently adopted a useful test articulated by the Sixth Circuit to determine whether an excessive force claim based on handcuffing may survive summary judgment: "A plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) the plaintiff complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Deavers v. Vasquez*, 57 F. Supp. 3d 599 (E.D. Va. 2014) (citing *Morrison v. Bd. of Trs.*, 583 F.3d 394, 401-02 (6th Cir. 2009)). This court agrees that the *Deavers* test is helpful given the circumstances and will apply it to Hanlon's claim.[8]

---

[8] And even if *Deavers* is too stringent a test, the court would nevertheless reach the same conclusion—that Officer Hanlon's actions were reasonable—applying the factors outlined in *Graham*.

### ii.    Application

Officer Hanlon was justified under *Graham* and its progeny in handcuffing and temporarily detaining Halter because his actions were reasonable and necessary based on a totality of the circumstances presented.

Officer Hanlon testified that he decided to handcuff Halter and move him away from the house to protect himself and secure a fluid scene involving a hidden suspect and hostile members of that suspect's family, including his mother who had just approached him with a weapon. (*See* Officer Hanlon Aff. ¶ 2.) The video footage confirms Officer Hanlon's testimony about the fast-moving and potentially dangerous circumstances that he faced. A criminal suspect had fled into the house from which Halter shortly thereafter emerged,[9] and the suspect had not been apprehended. Harper had lied to Officer Hanlon by claiming not to have made contact with Smith behind the house despite her emerging from that very place seconds later; she disobeyed Officer Hanlon's order for her to stay seated, instead standing up and walking into the house; and she reemerged a few moments later holding an object behind her back[10] as she walked out toward Officer Hanlon.

Based on all this, Officer Hanlon reasonably anticipated an impending physical altercation with Halter when he emerged from the house mere seconds after the officer had

---

[9] Halter points out that Smith fled into a basement apartment. Assuming that is true, it makes no difference. Officer Hanlon had no reason to suspect, let alone know, that the basement door led into a basement apartment that could not be accessed from inside the home. Officer Hanlon's assumption that the structure was a single-family dwelling was eminently reasonable.

[10] Officer Hanlon claims it was a makeshift knife; Halter claims it was a wooden paint stirrer. The court has not examined the object. Either way, the question is not what the object was; the question is whether Officer Hanlon reasonably believed it to be dangerous. Given that Harper approached the officer with an object hidden behind her back, after previously disregarding his command not to go inside the residence, Officer Hanlon's concern for his own safety (and the safety of the officers who were *en route*) was eminently reasonable.

disarmed and handcuffed Halter's wife. Indeed, Halter immediately challenged Officer Hanlon's authority to handcuff Harper ("What'd she do?" (Body Cam Video 1 at 19:48:41)) and his authority to give Halter orders ("I can stand here; I'm on private property." (*Id.* at 19:48:42)). Officer Hanlon reasonably perceived Halter at that moment to be agitated and posing a physical threat to him, particularly in light of what had just transpired with his wife. At that time, Officer Hanlon was also outnumbered at least four to one,[11] even though Harper was handcuffed and Harper's daughter had been compliant with Officer Hanlon's orders. And while all of this was ongoing, Officer Hanlon still had still not apprehended Smith, who he reasonably (and correctly) believed was hiding in the house. Officer Hanlon, in sum, did not have "unquestioned command of the situation" when he handcuffed Halter, *Summers*, 452 U.S. 692, and his handcuffing of Halter was a reasonable and prudent step toward gaining control of the chaotic scene.

Based on the evidence in the record, the court finds that the totality of the circumstances justified Officer Hanlon's actions in handcuffing and detaining Halter to protect himself and others.[12] *See Muehler*, 544 U.S. at 100. That Halter was subsequently released and not charged with any crime does not render Officer Hanlon's actions unlawful. *See id.*

---

[11] At a minimum, Officer Hanlon knew that he was alone, and that Smith, Harper, Halter, and Harper's daughter were on the scene. Officer Hanlon could not know who else would emerge from the house to degrade his control of the scene.

[12] Halter's detention would also be a lawful investigatory detention, as Officer Hanlon was simultaneously investigating who in that house was obstructing justice by helping a fleeing suspect elude police. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (holding that officers must possess "a reasonable, articulable suspicion that criminal activity is afoot" to execute a brief "investigatory detention"); *Bagley v. Boyte*, 94 F.3d 641 (table), 1996 WL 465845, at *3 (4th Cir. 1996) ("As a general rule, officers conducting an investigatory stop are authorized to take such steps as are reasonably necessary to protect their personal safety and maintain the status quo . . . .")

Turning to the duration of the detention, the court concludes that Officer Hanlon's keeping Halter handcuffed for about approximately 13 minutes[13] was reasonable under the circumstances. While Halter was handcuffed, Officer Hanlon and his colleagues were securing and investigating an active scene. There is no indication that Officer Hanlon unduly prolonged the time Halter was in handcuffs or acted other than diligently in wrapping up his investigation before releasing Halter. *See United States v. Sharpe*, 470 U.S. 675, 686 (1985). The time Halter spent in handcuffs was reasonable under the circumstances.

Halter also fails to satisfy the test specifically relating to his complaint about the handcuffing. As the court noted, "a plaintiff must offer sufficient evidence to create a genuine issue of material fact that: (1) the plaintiff complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Deavers*, 57 F. Supp. 3d at 607 (citing *Morrison v. Bd. of Trs.*, 583 F.3d 394, 401-02 (6th Cir. 2009)). Here, when Officer Hanlon opened the vehicle door to speak with Halter, Halter immediately said to him, "These are too tight, man." (Body Cam Video 2 at 20:01:07.) But Officer Hanlon did not ignore Halter's statement. Instead, he removed the handcuffs just over a minute later after briefly questioning Halter about what had transpired with Smith. (Body Cam Video 2 at 20:02:17). There is no evidence that Halter, at any other point, complained that the handcuffs were too tight, including when they were placed on him or when he was sitting on the curb. And as to Officer Hanlon's *method* of

---

[13] As a factual matter, Halter's allegation that he was handcuffed for "around 30 min[utes]" (*see* Compl. at 2) is flatly contradicted by the video footage. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

handcuffing Halter, the video footage directly refutes the allegation that they were improperly applied or applied in any inherently unusual or dangerous manner.[14]

Moreover, Halter has merely *alleged*—without submitting any evidence to support—that he has suffered nerve damage *from being handcuffed*.[15] There is no evidence, on the various videos or otherwise, that Halter was in significant pain or required immediate medical attention. The superficial indentation mark on Halter's wrist—shown briefly in Body Cam Video 2 and in the still images submitted with Officer Hanlon's motion (*see* Hanlon Aff. Ex. 5 [ECF No. 48-3])—does not satisfy the court that any injury was more than *de minimis*. Because the record is devoid of any evidence of a bona fide injury, and Halter has only made conclusory allegations alleging nerve damage, Halter has failed to show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for [him]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

When considering the totality of the circumstances, Officer Hanlon's actions were objectively reasonable under *Graham*, its progeny, and *Deavers/Morrison*. The force he used was not excessive and did not violate Halter's Fourth Amendment rights.[16]

---

[14] Officer Hanlon "applied single lock handcuffs" to Halter. (Officer Hanlon Aff. ¶ 4.) Halter does not appear to take issue with the use of these types of handcuffs or method of locking them; rather, he complains that his wrists were handcuffed one on top of the other. He also asserts that Hanlon "cranked the handcuffs all the way down, not placing a finger to check to see if it [was] to[o] tight as trained." (Pl.'s Supp. Br. pg. 1 [ECF No. 66].)

[15] This point is important. The court might very well be persuaded that Halter has severe nerve damage in his wrist, but that does *nothing* to create a genuine issue of material fact as to whether the 13 minutes in "tight" handcuffs caused that injury.

[16] Assuming for the sake of argument that this court concluded that Officer Hanlon's use of handcuffs under these circumstances constituted excessive force, he would nevertheless be entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To determine whether an official is entitled to qualified immunity, the court must first determine whether the facts, taken in the light most favorable to the

### B. Halter's Due Process Claim

Insofar as Halter alleges that his due process rights were violated, the amended complaint does not specify *how* they were violated. The due process heading is followed by the statement that "Officer Hanlon caused unnecessary pain and suffering." (Amend. Compl. at 2). The court interprets this claim as asserting one for a violation of Halter's substantive due process rights.[17] But as noted above, the Fourth Amendment controls Halter's claim of excessive force, and "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994). Because Halter's claims relating to his handcuffing fall squarely under the Fourth Amendment's prohibition against unreasonable seizures, he may not pursue his claim under the more general substantive due process right

---

plaintiff, show that the defendant's conduct violated a constitutional right. *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). Second, the court must evaluate whether the right was clearly established at the time of the defendant's conduct. *Smith*, 781 F.3d at 100. As discussed previously, the court finds that Officer Hanlon did not use excessive force by handcuffing Halter for about 13 minutes or Halter's being placed in the back of a police vehicle for between 11 or 11-and-a-half minutes, but instead acted reasonably under *Graham, et al.* But even if that conduct violated *Graham* and the Fourth Amendment, the right to not be handcuffed and temporarily detained in the rear of a police vehicle—even without suffering a bona fide injury while a summary arrest of a fleeing felony suspect is made, and a hectic scene and investigation is wound down—is not clearly established in this Circuit. *See, e.g.*, *Dolgos*, 884 F.3d at 193–95 (4th Cir. 2018) (surveying federal law on this question and concluding that "[t]he majority of federal circuit courts have rejected the notion that handcuffing a custodial arrestee, without more, is excessive," and that "[t]he prevailing federal rule appears to be that an arrestee may pursue a Fourth Amendment excessive force claim based on the use of handcuffs only in very limited circumstances, such as when the handcuffing causes physical injury.").

[17] "There are three kinds of Fourteenth Amendment claims that may be brought under 42 U.S.C. § 1983. First, claims may be brought for the denial of those specific protections in the Bill of Rights that have been made applicable to the states. Second, an individual may bring claims under the substantive component of the Due Process clause that bars certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them. Finally, a claim may be brought for a violation of procedural due process, which prohibits the deprivation of life, liberty, or property without fair procedure." *Lytes v. Smith*, 11 F. Supp. 3d 527, 534–35 (D.S.C. 2014) (cleaned up).

under the Fourteenth Amendment. *Accord Lauro v. Charles*, 219 F.3d 202, 208 (2nd Cir. 2000) ("Supreme Court decisions have held that where a claim can be characterized as a violation of the Fourth Amendment, it should be analyzed as such, and not as a substantive due process claim."); *Verdier v. Borough*, 796 F. Supp. 2d 606, 619 (E.D. Pa. 2011).

## IV.   CONCLUSION

For the foregoing reasons, Halter has failed to raise a genuine dispute of material fact regarding whether Officer Hanlon used excessive force. Based on the evidence before the court, Officer Hanlon is entitled to judgment as a matter of law.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 30th day of September, 2022.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE